# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

**MEUY SAECHAO**,

               Plaintiff,

   v.

**MICHAEL J. ASTRUE**, Commissioner,
Social Security Administration,

               Defendant.

Case No.: 6:11-cv-00513-SI

**OPINION AND ORDER**

MERRILL SCHNEIDER
Schneider Law Offices
PO Box 14490
Portland, OR 97293

     Of Attorneys for Plaintiff

S. AMANDA MARSHALL, United States Attorney
ADRIAN L. BROWN, Assistant United States Attorney
U.S. Attorney's Office, District of Oregon
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

DAVID MORADO, Regional Chief Counsel, Region X, Seattle
KEITH SIMONSON, Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
1301 Young Street, Suite A-702
Dallas, TX 75202

     Of Attorneys for Defendant

**SIMON, District Judge**.

## I.  INTRODUCTION

Meuy Saechao ("Ms. Saechao") brings this action under 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").  The court has jurisdiction under 42 U.S.C. § 405(g). Ms. Saechao argues that the Commissioner did not give specific and legitimate reasons for rejecting the opinions of several medical sources, failed to follow the remand order from the Commissioner's Appeals Council, and improperly discredited much of her testimony. The court finds that the Commissioner properly evaluated the medical opinions and followed the order of the Appeals Council. The Commissioner, however, improperly discredited Ms. Saechao's testimony. Accordingly, the decision of the Commissioner is reversed and the case is remanded for further proceedings consistent with the instructions herein.

## II.  BACKGROUND

Ms. Saechao was born in Laos and lived in Thailand for many years. She immigrated to Oregon in 1990. Tr. 324. After she arrived in the United States, Ms. Saechao worked at several jobs, including packing in a slaughterhouse, and folding sheets and washing vegetables in factories. Tr. 229.

### A.    Procedural History

On February 13, 2006, at the age of 42, Ms. Saechao applied for DIB and SSI. Tr. 195-202. After the Commissioner denied her applications initially and on reconsideration, Ms. Saechao requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 115-136. ALJ Riley J. Atkins held a hearing on October 6, 2008. Tr. 13-42. Following the hearing, the

ALJ issued a written decision denying Ms. Saechao's claims. Tr. 98-108. Ms. Saechao requested that the Appeals Council review the ALJ's decision. Tr. 165-66. The Appeals Council remanded the case to the ALJ with instructions to re-evaluate certain evidence, obtain additional evidence, and hold a new hearing. Tr. 110-113.

The ALJ held a new hearing on August 16, 2010. Tr. 65-78. The ALJ issued a new decision on August 26, 2010, again denying Ms. Saechao's claims. Tr. 43-59. Ms. Saechao again requested that the Appeals Council review the ALJ's decision. Tr. 10-12. The Appeals Council denied the request, and the ALJ's decision of August 26, 2010 became the final decision of the Commissioner. Ms. Saechao then filed a complaint in this court seeking review of that decision. Dkt. 2.

**B.    Medical and Other Evidence**

**1.   Ms. Saechao's testimony**

Ms. Saechao testified through an interpreter at the hearing held on October 6, 2008. She claimed to suffer from day-long headaches, accompanied by numbness in her hands and dizziness, one to three times each month. Tr. 19-20. She explained that the headaches and dizziness made it impossible for her to sit for more than 20 minutes at a time or for six hours of an eight-hour day. Tr. 21. She claimed that she could stand for 15 minutes. Tr. 20. She also testified that the dizziness caused her to "get up and lay down" throughout the day. Tr. 21-22.

Ms. Saechao also testified to experiencing severe depression. Tr. 22-24. She explained that she was worried about her daughter who still lived in Thailand. Tr. 22. When asked whether she was "too sad or too depressed to work," she replied yes. Tr. 24. Ms. Saechao did not give any

substantive testimony during the August 16, 2010, hearing.[1] *See* Tr. 70.

### 2. Drs. Frommlet and Crover.

Ms. Saechao has not had ongoing medical treatment for her alleged impairments. Records indicate that she visited an emergency room in August 2005 with a "probable migraine headache." Tr. 312. Dr. Michael Frommlet ordered a magnetic resonance imaging examination. The results showed no "significant vascular abnormality." Tr. 316. Ms. Saechao was discharged several hours later in stable condition. Tr. 312. In 2008, she was seen twice at South Tabor Family Physicians in Portland. Tr. 358-61. She described chronic headaches, body pain, and depression. *Id.* Dr. Jeana Crover, who examined Ms. Saechao during both visits, assessed a back strain and foot pain likely due to neuropathy.[2]

### 3. Dr. Ogisu

On March 14, 2006, Dr. Tatsuro Ogisu performed a comprehensive neurology examination. Tr. 320. Ms. Saechao described several medical impairments, including episodic headaches for the last ten years that occur approximately three times per year and last one to two days. Tr. 320. She also reported "vertigo not associated with her headaches about twice per week." *Id.* In addition, Ms. Saechao described "overall body pain," which she attributed to "having been beaten as a child." Tr. 321. Dr. Ogisu observed that Ms. Saechao was "oriented to the state and city, but only the date, not the month or the year[.]" Tr. 321. He noted that Ms. Saechao "had difficulty following simple commands" and that she "is illiterate and unable to spell any words." *Id.* She can perform "single-digit addition but nothing beyond that." *Id.*

---

[1]  Ms. Saechao's only testimony was to confirm the year – 1990 – she arrived in the United States. Tr. 70. The balance of the hearing involved the testimony of a vocational expert.

[2]  Neuropathy is "[a]ny disease of the nerves." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1575 (Donald Venes et al. eds. 2009).

Dr. Ogisu observed that Ms. Saechao had cervical lordosis, a limited cervical range of motion, and walked with a limp. Tr. 322. He found, however, that her reaching was unrestricted, and she showed no signs "of difficulty handling things." *Id.* He wrote that Ms. Saechao's "range of motion is full at the shoulders, the elbows, the forearms, the wrists and the hands; the hips, the knees and the ankles. No abnormality of muscle tone is noted." Tr. 322-23. He concluded that Ms. Saechao could "lift and carry at least 10 pounds on an occasional basis" and that she "should be able to perform gross and fine manipulation frequently." Tr. 323.

### 4. Dr. Kolilis

Dr. Duane Kolilis performed a psychodiagnostic evaluation on March 21, 2006. Tr. 324. Ms. Saechao reported that her "mother was physically and emotionally abusive" and that "at the age of 5 or 6 she was sold by her mother to an uncle." Tr. 324. Ms. Saechao never attended school and "is illiterate in her own language." Tr. 325. Dr. Kolilis observed that other "than going for a walk occasionally and infrequently fishing, [Ms. Saechao] spends most of her time at home." Tr. 325. Ms. Saechao reported that her sleep and appetite were poor and that she felt worthless. Tr. 326. Dr. Kolilils found that Ms. Saechao "has the criteria to support an Adjustment Disorder with Mixed Anxiety and Depressed Mood[.]" Tr. 327. He noted, however, that if "she was employed, these issues would likely resolve." *Id.* Dr. Kolilis concluded that Ms. Saechao is "capable of: understanding, remembering, and following at least simple one- to two-step instructions, sustaining concentration and attention, persisting in work-related activities, adapting to changes in routine, and engaging in appropriate social interactions." *Id.* He estimated that she is "functioning in the Low Average Range of intellectual abilities." *Id.*

### 5. Dr. Ellison

Dr. John Ellison performed a comprehensive general examination on May 22, 2010.

Tr. 362. Ms. Saechao reported that "she hurts everywhere and is generally weak." *Id.* She stated

that the pain was most severe in her feet and that "[s]ometimes this pain is so bad she cannot

walk." *Id.* She reported that "[c]ooking is problematic because of her forgetfulness." *Id.*

Following his examination, Dr. Ellison completed a "medical source statement"[3] form. The form

consists of six pages of check-the-box responses to questions regarding Ms. Saechao's ability to

perform "work-related activities." *See* Tr. 367-372. Dr. Ellison checked boxes indicating that

Ms. Saechao could lift up to 10 pounds frequently, and up to 20 pounds occasionally. Tr. 367. He

also checked boxes indicating that Ms. Saechao could not perform work involving reaching,

pushing, or pulling with her right hand, or climbing stairs, ramps, or ladders. He checked boxes

indicating that she should never perform work involving balancing, stooping, kneeling,

crouching, crawling, or driving. Tr. 370-71. Finally, he checked boxes recommending that

Ms. Saechao should never be exposed to moving mechanical parts or unprotected heights and

only occasionally exposed to humidity, dust, fumes, extreme temperatures, or vibrations. Tr. 371.

### 6. Dr. Gostnell

Dr. David Gostnell, a clinical neuropsychologist, performed a psychodiagnostic

evaluation on June 1, 2010. Tr. 382. Dr. Gostnell interviewed Ms. Saechao through an

interpreter. Ms. Saechao "had no apparent difficulty understanding interview questions, although

at times the interpreter seemed somewhat confused or perplexed by her answers, which had to be

repeated or rephrased." Tr. 385. Dr. Gostnell diagnosed pain disorder associated with

psychological factors and medical conditions, recurrent and moderate major depressive disorder,

---

[3] "Medical source statements are medical opinions submitted by acceptable medical sources . . . about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis. . . . Medical source statements are to be based on the medical sources' records and examination of the individual; i.e., their personal knowledge of the individual." Social Security Ruling 96-5p, 1996 WL 374183 *4.

and chronic recurrent headaches and body pain. Tr. 387. He also made a provisional diagnosis of mental retardation, not otherwise specified. *Id.*

### 7.  Drs. Kehrli and Alley

In 2006, medical consultants Dr. Martin Kehrli and Dr. Richard Alley reviewed Ms. Saechao's medical records, but did not personally interview or examine her. Based on their reviews, both Dr. Kehrli and Dr. Alley recommended that Ms. Saechao perform only sedentary work. Tr. 350, 356.

## III. DISABILITY DETERMINATION AND STANDARDS

### A.  Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011). The five steps in the process proceed as follows:

1.  Is the claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.  Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.  Does the impairment 'meet or equal' one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.      Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.      Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof for the first four steps in the process. *Id.* at 953; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel,* 180 F.3d 1094, 1100 (9th Cir. 1999); *see also* 20 C.F.R. § 404.1566 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, then the claimant is disabled.  If, however, the Commissioner proves that the claimant is able to perform other work that exists in significant numbers in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54.

**B.      The ALJ's Decision**

The ALJ applied the Commissioner's five-step sequential disability determination process set forth in 20 C.F.R. §§ 404.1520 and 416.920, and described above. The ALJ agreed that Ms. Saechao was not engaged in substantial gainful activity and, consequently, satisfied step one. Tr. 48.

At step two, the ALJ found that Ms. Saechao suffered from several severe impairments: chronic headaches, left knee degenerative disease, right shoulder subacromial bursitis, right fourth finger injury, pain disorder associated with psychological factors and medical condition,

depression, and adjustment disorder with mixed anxiety and depressed mood. *Id.* Thus, Ms. Saechao satisfied step two.

At step three, the ALJ found that Ms. Saechao "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments[.]" Tr. 49. The ALJ, thus, proceeded to step four.

The fourth and fifth steps require the ALJ to determine how the claimant's impairments affect the claimant's ability to perform work. To make this determination, the ALJ formulates the claimant's residual functional capacity ("RFC"). An RFC "is the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 416.945(a)(1). An RFC "is used at step 4 of the sequential evaluation process to determine whether an individual is able to do past relevant work, and at step 5 to determine whether an individual is able to do other work, considering his or her age, education, and work experience." Social Security Ruling ("SSR") 96–8p.[4] The ALJ found that Ms. Saechao had an RFC to perform light work, subject to some restrictions in movement. The ALJ also found that Ms. Saechao "is limited to simple or unskilled work without public contact" and should "not be required to perform work where English literacy is required." Tr. 50.

After the ALJ has formulated the claimant's RFC, the ALJ must consider whether the claimant can, in light of that RFC, perform past or other work. To do so, the ALJ may rely on the testimony of a vocational expert ("VE"). 20 C.F.R. §§ 416.960(b)(2) and 416.966(e). Typically, the ALJ asks the VE whether, given certain hypothetical assumptions about the claimant's capabilities, "the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy." *Burkhart v. Bowen*, 856 F.2d 1335, 1340 n.3 (9th Cir. 1988). In

---

[4] The Commissioner publishes rulings to clarify the Social Security Administration's regulations and policy. See *Bunnell v. Sullivan*, 947 F.2d 341, 346 n.3 (9th Cir.1991) (*en banc* ). Although they do not carry the force of law, SSRs are binding on an ALJ. *Bray v. Comm'r*, 554 F.3d 1219, 1224 (9th Cir. 2009).

response, the "VE must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities and vocational qualifications would satisfy." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162-63 (9th Cir. 2001). The job must exist "in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. § 404.1566(a); 20 C.F.R. § 416.966(a).

The ALJ called a VE to testify during the 2010 administrative hearing. The ALJ asked the VE to consider a hypothetical claimant with restrictions similar to those formulated for Mr. Saechao's RFC. The VE replied that Ms. Saechao's limitations would make performing her prior work "problematic." Tr. 72. The VE indicated, however, that a claimant with Ms. Saechao's limitations could perform work in the plastics industry as an extruder machine operator. Tr. 74.

Based on the VE's testimony, the ALJ found that Ms. Saechao "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. 58. The ALJ thus concluded that Ms. Saechao was not disabled. *Id*.

## IV.  STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

## V.  DISCUSSION

Ms. Saechao argues that the ALJ: (1) did not give specific and legitimate reasons for

rejecting the opinions of several medical sources; (2) failed to follow the remand order from the

Commissioner's Appeals Council; and (3) improperly discredited much of Ms. Saechao's

testimony. The court finds that the ALJ properly evaluated the medical opinions and followed

the order of the Appeals Council. The ALJ, however, improperly discredited Ms. Saechao's

testimony.

## A.      Medical Testimony

An ALJ must determine the weight to give each source of evidence. 20 C.F.R.

§ 404.1527(d), (f). Opinions from "acceptable medical sources" – such as licensed medical

doctors and psychologists – may generally be accorded more weight than those from "other

sources" – such as social workers, family, and friends. *Gomez v. Chater*, 74 F.3d 967, 970 (9th

Cir. 1996); 20 C.F.R. § 404.1513. An ALJ may wholly or partially discount the opinion of any

source, but the regulations and Ninth Circuit case law have established specific standards an ALJ

must apply in order to do so. *See* 20 C.F.R. § 404.1527 (standards for evaluating medical

opinions); *Lester v. Chater*, 81 F.3d 821, 830-33 (9th Cir. 1995) (standards for evaluating

acceptable medical sources); *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993) (standards

for evaluating other sources).

The standards for evaluating the opinion of an acceptable medical source differ

depending on the extent of contact the source had with the claimant and whether the source is

contradicted by other sources in the record. *Lester*, 81 F.3d at 830-33. In general, an ALJ should

"give more weight to the opinion of a source who has examined [the claimant] than to the

opinion of a source who has not examined" the claimant. 20 C.F.R. § 404.1527(d)(1). An ALJ

may, however, reject the opinion of a doctor who has examined the claimant in favor of the

differing opinion of a non-examining doctor if the ALJ "gives specific, legitimate reasons for

doing so, and those reasons are supported by substantial record evidence." *Roberts v. Shalala*, 66

F.3d 179, 184 (9th Cir. 1995). The standard is more exacting if no medical opinion contradicts an

examining doctor's opinion. In that instance, the ALJ may only reject the examining doctor's

opinion if the ALJ provides "'clear and convincing' reasons" for doing so. *Lester*, 81 F.3d at 830

(quoting *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990)).

### 1. Dr. Kolilis

Based on an examination of Ms. Saechao, Dr. Kolilis concluded that Ms. Saechao "is

capable of: understanding, remembering, and following at least simple one- to two-step

instructions; sustaining concentration and attention, persisting in work-related activities, adapting

to changes in routine, and engaging in appropriate social interactions. Her overall attention and

concentration today appeared to be fairly good." Tr. 327. The ALJ found that "Dr. Kolilis's

opinion is consistent with the record as a whole[.] . . . I give his opinion great weight. The

Claimant is limited to simple or unskilled work without public contact." Tr. 55.

Ms. Saechao contends, however, that the ALJ failed to properly credit Dr. Kolilis's

opinion. Her argument is based on the job descriptions in the Dictionary of Occupational Titles

("DOT"). "Each occupation in the DOT is coded with a reasoning development level, which

corresponds to the ability to follow instructions and solve problems that is required for

satisfactory job performance." *Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010). The DOT

describes six different reasoning development levels. At level one, an individual can "[a]pply

commonsense understanding to carry out simple one- or two-step instructions. Deal with

standardized situations with occasional or no variables in or from these situations encountered on

the job." DOT, App. C (available at 1991 WL 688702). At level two, an individual can "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." *Id.*

Ms. Saechao argues that Dr. Kolilis's opinion necessarily limits her to reasoning level one work: "A . . . limitation to task[s that] require 'simple one- to two- steps' . . . restricts a claimant to only performing reasoning level one jobs." Pl.'s Br. at 8. The ALJ, however, did not include, in his hypothetical question to the VE, a limitation to reasoning level one occupations or to one- to two-step tasks. Tr. 72. Consequently, in response to the ALJ's hypothetical question, the VE stated that Ms. Saechao could perform the work of an extruder machine operator, an occupation that requires reasoning level two. Tr. 74; DOT 754.685-014 (available at 1991 WL 680374). Ms. Saechao concludes that the "ALJ has erred by implicitly rejecting Dr. Kolilis'[s] opinion for no reason and this error was not harmless because had the actual limitations been included, [Ms.] Saechao would not have been able to perform the jobs identified at step five" of the sequential analysis. Pl.'s Br. at 8-9.

Ms. Saechao is correct that if Dr. Kolilis had limited her to work involving one- to two-step tasks, the ALJ would have erred in failing to include a restriction to reasoning level one occupations in the hypothetical question posed to the VE. *See Whitlock v. Astrue*, No. 3:10-cv-357-AC, 2011 WL 3793347 *5 (D. Or. Aug. 24, 2011) (so finding). Dr. Kolilis, however, did not *limit* Ms. Saechao to one- to two-step tasks. His opinion stated that Ms. Saechao is capable of "following *at least* simple one- to two-step instructions." (Emphasis added.) In other words, one- to two-step tasks are the minimum of Ms. Saechao's reasoning abilities, not the limit. Moreover, the entirety of Dr. Kolilis's opinion supports finding that Ms. Saechao is capable of reasoning level two occupations. Dr. Kolilis noted, for example, that Ms. Saechao was capable of

"sustaining concentration and attention, persisting in work-related activities, [and] adapting to changes in routine." Tr. 327. Other doctors reached similar conclusions. While Dr. Gostnell found that Ms. Saechao would have moderate difficulty understanding and remembering complex instructions, he found that she would have only mild limitations in carrying out simple instructions. Tr. 388. Dr. Peter LeBray, who reviewed Ms. Saechao's medical records, concluded that she could "understand, perform and complete simple tasks[.]" Tr. 353. Courts in this district have generally found that "a claimant limited to simple, routine tasks may perform level-two reasoning." *Pitts v. Astrue*, No. 3:10-cv-00785-MO, 2011 WL 3704124 *7 (D. Or. Aug. 23, 2011); *see also Tracer v. Astrue*, No. 3:10-cv-6180-HZ, 2011 WL 2710271 (D. Or. July 12, 2011) (collecting cases).

### 2. Dr. Ellison

As noted above, Dr. Ellison found that Ms. Saechao has several limitations, including total restrictions in reaching, pushing, and pulling with her right hand, climbing stairs, ramps, and ladders, balancing, stooping, kneeling, crouching, crawling, and driving. He recommended that Ms. Saechao never be exposed to moving mechanical parts and unprotected heights. Tr. 369-70. Dr. Ellison also recommended that Ms. Saechao only occasionally be exposed to humidity, dust, fumes, extreme temperatures, and vibrations. Tr. 371. The ALJ assigned Dr. Ellison's opinion "limited weight." Tr. 56. He provided three reasons for discounting Dr. Ellison's findings: (1) Dr. Ellison's opinion conflicts with the other medical evidence in the record; (2) his opinion conflicts with Ms. Saechao's activities of daily living; and (3) his findings are based only on Ms. Saechao's subjective complaints. Ms. Saechao argues that these reasons are not legitimate. Pl's Br. at 9-11.

The court disagrees. The ALJ is correct that other medical evidence contradicts

Dr. Ellison's findings. Dr. Ogisu, who also examined Ms. Saechao, found that Ms. Saechao had

no restrictions reaching, displayed no difficulty handling things, and had a full range of motion

"at the shoulders, the elbows, the forearms, the wrists and the hands; the hips, the knees and the

ankles." Tr. 322. Dr. Ogisu's contradictory findings, however, are not alone sufficient to reject

Dr. Ellison's opinion: "[T]he opinion of an examining doctor, even if contradicted by another

doctor, can only be rejected for specific and legitimate reasons that are supported by substantial

evidence in the record." *Lester*, 81 F.3d at 830-31.

The other two reasons cited by the ALJ for discounting Dr. Ellison's conclusions –

Ms. Saechao's activities of daily living and Dr. Ellison's reliance on Ms. Saechao's subjective

complaints – are specific and legitimate reasons sufficient for the ALJ to reject Dr. Ellison's

opinion. An ALJ may afford less weight to an opinion that is contradicted by other evidence in

the record. *Cf*. 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as

a whole, the more weight we will give to that opinion"). An ALJ may also discount the opinion

of a medical source if it not based on medical signs or laboratory findings or if it does not

explain its findings. *Id.* at § 404.1527(c)(3) ("The more a medical source presents relevant

evidence to support an opinion, particularly medical signs and laboratory findings, the more

weight we will give that opinion. The better an explanation a source provides for an opinion, the

more weight we will give that opinion.").

The ALJ is correct that Ms. Saechao's activities of daily living appear to contradict some

of Dr. Ellison's findings. For instance, Ms. Saechao drives, prepares meals, performs some

shopping, and does laundry. Tr. 240-41, 248-49. These activities contradict his findings that she

cannot drive and should not be exposed to moving mechanical parts, fumes, or vibrations. In

addition, as the ALJ correctly notes, Dr. Ellison's findings do not appear to be based on medical

signs or laboratory findings. Indeed, Dr. Ellison provided no explanation for the majority of the limitations he recommended; he simply checked boxes on a form. *See* Tr. 367-72. Accordingly, the ALJ provided specific and legitimate reasons to reject Dr. Ellison's opinion.

### 3.  Drs. Kehrli and Alley

Medical consultant Dr. Kehrli recommended that Ms. Saechao be limited to sedentary work. Tr. 350. The ALJ, however, wrote that Dr. Kehrli "opined [that Ms. Saechao] retains the ability to perform light work." Tr. 54. Ms. Saechao is correct that the "ALJ has misstated what [Dr.] Kehrli . . . opined." Pl.'s Br. at 11. Ms. Saechao is also correct that Dr. Alley, who also reviewed Ms. Saechao's medical records, "suggested [a] sedentary RFC." Tr. 356 (capitalization omitted). Nevertheless, these errors are not, alone, sufficient for reversal. The examining physicians, Drs. Ogisu and Ellison, did not recommend limiting Ms. Saechao to sedentary work and the opinions of non-treating and non-examining medical sources, such as Drs. Kehrli and Alley, do not, on their own, constitute substantial evidence. *Lester*, 81 F.3d at 831 ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."). Thus, it was not erroneous for the ALJ to omit a limitation to sedentary work in either his hypothetical question to the VE or in his formulation of Ms. Saechao's RFC. Given, however, that Ms. Saechao's case is reversed and remanded for other reasons, on remand the ALJ should re-evaluate the medical evidence and consider whether Ms. Saechao should be limited to sedentary work.

### 5.  Dr. Ogisu

Finally, Ms. Saechao argues that the ALJ "erred by not seeking clarification of Dr. Ogisu's opinion, failing to resolve[] the ambiguity in Dr. Ogisu's opinion and relying on this

opinion to find that Mrs. Saechao can perform light work." Pl.'s Br.13. Dr. Ogisu opined that

Ms. Saechao could "lift and carry at least 10 pounds on an occasional basis." Tr. 323.

Ms. Saechao contends that this opinion leaves it unclear whether Ms. Saechao is capable of

performing "light work," as that category of work is defined in the Social Security

Administration Rules.[5] Whether Ms. Saechao qualifies for "light work" is crucial, Ms. Saechao

argues, because if she does not qualify for light work, and only qualifies for sedentary work, she

must be found to be disabled pursuant to Social Security Administration Rules. Pl.'s Br. at 12;

*see* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.17.

    The court disagrees. "Light works" involves "lifting no more than 20 pounds at a time

with frequent lifting or carrying of objects weighing *up to* 10 pounds." 20 C.F.R. § 404.1567(b)

(emphasis added). Dr. Ogisu's opinion is consistent with this definition. It states that

Ms. Saechao can lift and carry *at least* 10 pounds occasionally. Other findings in Dr. Ogisu's

opinion support his conclusion. For instance, he found that Ms. Saechao's "range of motion is

full at the shoulders, the elbows, the forearms, the wrists and the hands. . . . No abnormality of

muscle tone is noted." Tr. 322-23. He also rated muscle strength in the upper extremities at "4/5

to 4+/5." Tr. 322. Dr. Kehrli, who reviewed Dr. Ogisu's findings, found that Ms. Saechao can lift

and carry 10 pounds frequently. Tr. 344. Even Dr. Ellison, whose opinion the ALJ determined to

be overly restrictive of Ms. Saechao's capabilities, found that Ms. Saechao could lift up to 10

pounds frequently. Tr. 367. This evidence establishes that Ms. Saechao can frequently lift 10

pounds, as required in the definition of "light work."

    Dr. Ogisu's opinion is not ambiguous merely because it does not track, word-for-word,

---

    [5]  To determine the physical exertion requirements of work in the national economy, the
Social Security Administration "classif[ies] jobs as sedentary, light, medium, heavy, and very
heavy." 20 C.F.R. § 404.1567; *see also* SSR 83-10. The classifications are based in part on the
amount of weight a claimant can lift and carry. *Id.*

the formulation used in the definition of "light work" in 20 C.F.R. § 404.1567(b). The ALJ reasonably determined that Dr. Orgisu's opinion is consistent with the definition of light work. The ALJ's determination also is consistent with the other medical evidence. Accordingly, the Dr. Ogisu's opinion is not impermissibly ambiguous and the ALJ did not err in relying on it.

**B.      Remand Order**

Ms. Saechao next argues that the ALJ failed to comply with the order of the Social Security Administration Appeals Council reversing the ALJ's initial, February 3, 2009, decision that denied benefits to Ms. Saechao. Pl.'s Br. at 13. The order of the Appeals Council required the ALJ to obtain "additional evidence concerning the claimant's mental and physical impairments[.]" Tr. 112. As Ms. Saechao concedes, however, the ALJ "*did obtain updated* medical records; he obtained . . . consultative examination[s] from John Ellison, M.D., and David Gostnell, Ph.D." Pl.'s Br. at 14 (emphasis added).

Ms. Saechao's argument is not, therefore, that the ALJ failed to comply directly with the order of the Appeals Council. Instead, Ms. Saechao argues that the ALJ "sidestepped" the order because, although the ALJ obtained additional evidence, the ALJ did not fully credit that new evidence. Pl.'s Br. at 14. The Appeals Council, however, did not order the ALJ to fully credit the additional evidence he obtained. Accordingly, the ALJ did not fail to comply with – or sidestep – the order of the Appeals Council. The ALJ is responsible for "evaluat[ing] *every* medical opinion" he or she receives. 20 C.F.R. § 404.1527(c) (emphasis added); *see also Carmickle v. Comm'r*, 533 F.3d 1155, 1164 (9th Cir.2008) (The ALJ "is responsible for resolving conflicts in the medical record."). The ALJ thus did not err in evaluating – and discounting in part – the additional evidence he received, even though he obtained the evidence pursuant to an order from the Appeals Council.

Ms. Saechao also argues that the ALJ erred "because the wrong interpreter was ordered" for the examinations performed by Drs. Ellison and Gostnell. Ms. Saechao asserts that a Laotian interpreter was used "when her first language is Mien." Pl.'s Br. at 14-15. On her disability report, however, Ms. Saechao listed her preferred language as Laotian. Tr. 221. In a field office report prepared in December 2006, an interviewer noted that Ms. Saechao "chose to speak in her native language of Laotian." Tr. 219. Neither Dr. Ellison nor Dr. Gostnell reported that Ms. Saechao was unable to understand his questions. In fact, Dr. Gostnell observed that Ms. Saechao "had no apparent difficulty understanding interview questions," even though the interpreter sometimes seemed "perplexed by her answers." Tr. 385. Both doctors were able to write reports based in large part on Ms. Saechao's responses to their questions. *See* Tr. 362-72, 382-90. There is, in sum, no evidence that the either Dr. Ellison or Dr. Gostnell were unable to effectively communicate with Ms. Saechao beyond the ordinary difficulties posed by speaking through an interpreter and understanding cultural differences.

**C.    Ms. Saechao's Testimony**

**1.    Standards**

The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*

*v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, "if the claimant meets the first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill*, 12 F.3d at 918. Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). Further, the ALJ "may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Lester*, 81 F.3d at 834.

Both the Social Security Administration and the Ninth Circuit have set forth a variety of tools that an ALJ may use to assess a claimant's credibility. In SSR 96-7p, the Commissioner recommended assessing the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms.

In addition to the factors identified in SSR 96-7p, the Ninth Circuit has said that an ALJ "may consider . . . ordinary techniques of credibility evaluation, such as the reputation for lying, prior inconsistent statements concerning the symptoms, . . . other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or

to follow a prescribed course of treatment." *Smolen*, 80 F.3d at 1284.

### 2.    The ALJ's credibility analysis

The ALJ found that Ms. Saechao met the first step of the credibility analysis: Ms. Saechao's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" Tr. 51. Nevertheless, the ALJ discounted many of Ms. Saechao's reports of her symptoms. He identified three reasons for questioning her credibility: (1) Ms. Saechao's activities of daily living were "inconsistent with the disabling levels of pain and mental health symptoms [she] alleged"; (2) frequent inconsistent statements weakened Ms. Saechao's credibility; and (3) "conservative treatment" suggested that Ms. Saechao's "impairments do not result in significant functional limitation[s that] preclude[] her from engaging in basic work activity." Tr. 53-54. The evidence in the record does not support ALJ's conclusions.

### a.    Activities of daily living

The ALJ found that Ms. Saechao's activities of daily living are "quite involved." He noted that she "handles her own finances, spends one hour shopping in stores for groceries, and prepares her own meals, which takes up to 30 minutes. She attends church services weekly." Tr. 53. He also found that she can drive and likes to sew, fish, and watch television. *Id.* Altogether, however, these activities comprise, at best, an extremely small part of Ms. Saechao's daily life. For example, she shops for an hour at a time only 2-3 times a week, attends church only once a week, and sews only 2-3 hours a month. Tr. 241-42. Furthermore, even when she accomplishes these daily activities, she reportedly performs them poorly. For instance, she burned a cooking pot and can no longer cook some foods. Tr. 248, 287. Finally, Ms. Saechao's daughter, Nai Saechao, submitted a letter that contradicts the ALJ's finding that Ms. Saechao sometimes fishes and sews. Tr. 287 (Ms. Saechao can "no longer fish or do embroidery").

These sorts of limited activities of daily living are not sufficient to discredit
Ms. Saechao's testimony. Daily "activities may be grounds for an adverse credibility finding 'if a
claimant is able to spend a substantial part of his day engaged in pursuits involving the
performance of physical functions that are transferable to a work setting.'" *Orn v. Astrue*, 495
F.3d 625, 639 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).
Ms. Saechao's occasional trips to the grocery store and weekly attendance at church constitute
neither a substantial part of her day nor involve the performance of physical functions that are
transferable to a work setting. The "mere fact that a plaintiff has carried on certain daily
activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d
1044, 1050 (9th Cir. 2001). Accordingly, the court concludes that Ms. Saechao's activities of
daily living do not undermine her credibility.

### b.    Inconsistent statements

The ALJ next reasoned that Ms. Saechao's inconsistent statements call her credibility
into question. The ALJ identified three examples of inconsistencies. First, he noted that
Ms. Saechao reported two different causes for back pain. She told Drs. Ogisu and Kolilis that she
believed the pain originated from being beaten as a child. Tr. 321, 325. Two years later, she told
a doctor at South Tabor Family Physicians that she had had back pain for a year since bumping
into another pedestrian while crossing a street. Tr. 358. Although the ALJ correctly notes the
differing explanations, the discrepancy does not cast doubt on Ms. Saechao's credibility. These
explanations are not mutually exclusive; it may be that Ms. Saechao's collision with the
pedestrian aggravated pain that originated with from her childhood beatings. In addition,
although Ms. Saechao's explanations may differ, her reports of the pain are consistent. It is also

not surprising, that a layperson's understanding and hence explanation for the cause of her persistent pain might evolve, especially after more than two years.

The ALJ also identified an inconsistency between Ms. Saechao's report to Dr. Ogisu that she experienced headaches three times per year, Tr. 320, and her report, more than two years later, to Dr. Crover at South Tabor Family Physicians that she experienced headaches "approximately everyday." Tr. 361. This is not an inconsistency, however, because Ms. Saechao told Dr. Crover that her "symptoms have worsened in the past two months." Tr. 361. As the Social Security Administration has explained, "the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or *may worsen or improve with time*, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms." SSR 96-7p, 1996 WL 374186 *5 (emphasis added).

The final inconsistency noted by the ALJ was between differing explanations Ms. Saechao gave for being laid off from her last job. She reported to Dr. Kolilis that she was "laid off after the jobs were sent to an overseas company." Tr. 325. She told Dr. Gostnell, more than four years later, that she was laid off because "her manager did not like her." Tr. 384. It is difficult to understand how this difference calls Ms. Saechao's credibility into question. More than four years elapsed between the statements; the difference may be attributable to a faded memory or confusion. The explanations are not, moreover, mutually exclusive: both could be true. All told, the three purported inconsistencies identified by the ALJ do not establish that Ms. Saechao's has engaged in a pattern of deception sufficient to discredit her testimony.

c.    **Conservative course of treatment**

The ALJ's final reason to question Ms. Saechao's credibility is her conservative course of treatment. The ALJ noted that Ms. Saechao had sought medical treatment only three times after 2005. Tr. 54. The ALJ also noted that Ms. Saechao's "lack of counseling and limited medication . . . are . . . not consistent with the alleged severity of her impairments." *Id.* In general, "evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (internal quotation marks and citation omitted). A claimant may not, however, be "denied benefits for failing to obtain medical treatment that would ameliorate his condition if he cannot afford that treatment." *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995); *see also Gillman v. Astrue*, ___ F. Supp. 2d ___, No. C10-1535Z, 2011 WL 5299579 (W.D. Wash. Nov. 3, 2011) ("Conservative treatment is not a proper basis for rejecting the claimant's credibility when the claimant has a good reason for not seeking more aggressive treatment.").

Ms. Saechao repeatedly explained that she had not received more medical treatment because she did not have insurance and could not afford treatment. In a 2006 disability report, she stated that "because [I] don't have medical insurance[, I] can't[t] receive any medical care." Tr. 280. Dr. Ogisu reported that Ms. Saechao "has not pursued medical follow-up due to lack of insurance." Tr. 320. Ms. Saechao testified in the 2008 hearing that she did not have medical insurance and that she could not see a doctor because she had no money. Tr. 24, 27. Ms. Saechao's inability to afford treatment, and her limited language skills, are reasonable explanations for her conservative course of treatment.

For all of these reasons, the ALJ has failed to provide clear and convincing reasons to discredit Ms. Saechao's testimony.

**D.    Remand**

The court may, in its discretion, remand a case to the Commissioner for immediate

payment of benefits. In "Social Security Act cases Congress has granted district courts the

additional power to reverse or modify an administrative decision without remanding the case for

further proceedings." *Harman v. Apfel*, 211 F.3d 1172, 1177-78 (9th Cir.2000). The Ninth

Circuit has set forth a three-part test for determining whether to remand a case for further

proceedings or to order an immediate award of benefits. Immediate payment of benefits is

appropriate where: (1) the ALJ failed to provide legally sufficient reasons for rejecting the

claimant's testimony; (2) no outstanding issues remain for the ALJ to resolve; and (3) it is clear

from the record that the ALJ would be required to find the claimant disabled were such

testimony credited. *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir.2004).

Although the ALJ failed to articulate legally sufficient reasons for rejecting Ms.

Saechao's testimony, it is unclear whether a finding of disability would be required had Ms.

Saechao's testimony been credited as true. Ms. Saechao's testimony during the hearings was

limited. Ms. Saechao did not thoroughly explain the effect of her headaches on her ability to

participate in the activities of daily living or on her ability to perform work activity. In addition,

the hearing transcript revealed frequent difficulties with translation. Even if, therefore, the court

credited all of Ms. Saechao's testimony as true, it is unclear whether a finding of disability would

be warranted. On remand, the Commissioner should hold a new hearing to take additional

testimony from Ms. Saechao and evaluate that testimony based on SSR 96-7p and the Ninth

Circuit standards described above.

**VI. CONCLUSION**

The Commissioner's decision is REVERSED and the case is REMANDED. On remand,

the Commissioner should hold a new hearing to take additional testimony from Ms. Saechao. If the Commissioner finds that Ms. Saechao's testimony is in part or in whole not credible, the Commissioner should specifically identify what portions of her testimony are not credible and provide specific, clear, and convincing reasons explaining why that testimony is not credible. In addition, the Commissioner should reevaluate Dr. Kehrli and Dr. Alley's opinions to determine whether to credit their opinions that Ms. Saechao is limited to sedentary work. If the Commissioner credits their opinions, the Commissioner should decide whether to formulate a new RFC and reconsider steps four and five of the sequential disability analysis.

IT IS SO ORDERED.

Dated this 11th day of May, 2012.

/s/ Michael H. Simon
_____

Michael H. Simon
United States District Judge